

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **JAMES A. GREGG** | § | Case No. 10-41181 |
| xxx-xx-9930 | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| JERRY BEANE and | § | |
| LINDA BEANE | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Adversary No. 10-4162 |
| | § | |
| JAMES A. GREGG | § | |
| | § | |
| Defendant | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Upon trial of the complaint filed by the Plaintiffs, Jerry and Linda Beane (the

"Plaintiffs"), seeking a determination of whether an alleged debt owed to it by the

Debtor-Defendant, James A. Gregg ("Defendant"), is dischargeable, the Court issues the

following findings of fact and conclusions of law.  The Plaintiffs contend that the debt is

non-dischargeable as a debt obtained by fraud or by false representations pursuant to 11

U.S.C. §523(a)(2)(A), as a debt arising from a defalcation by a fiduciary under §523(a)(4)

or as a debt for a willful and malicious injury to person or property under §523(a)(6).

---

[1]  These findings of fact and conclusions of law are not designated for publication and shall not considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines.

Solely as an alternative in the event that the debt is not rendered non-dischargeable under the referenced subsections of §523(a), the Plaintiffs seek a denial of the discharge to the Debtor-Defendant.  After the trial, the Court took the matter under advisement.

## FINDINGS OF FACT

1.   At all times relevant to this case, the Defendant was an officer, sole director and sole shareholder of GCS-Gregg Construction Services, Inc. (the "company" or "GCS"),[2] a contracting company with which the Plaintiffs entered into a residential construction contract on December 23, 2008 for repairs, renovation, and construction on their home located in Dallas.[3]

2.   The Defendant represented to the Plaintiffs that he was an experienced residential remodeling contractor who could timely complete the renovation of their home in accordance with the architect's plans, and in a good and workmanlike manner.[4]

3.   The contractual completion date of the Plaintiffs' construction project was May 1, 2009, at which time substantial completion had to be accomplished.[5]

4.   The original amount to be paid under the contract by the Plaintiffs was $281,575.[6]

5.   The Defendant and his company was obligated to pay on a timely basis all subcontractors and suppliers that offered services or supplies as to the construction on the Plaintiffs' property.

---

[2]   Stipulated facts 3(c) and (d) on p. 3-4 of the PTO.  This is the first of several factual stipulations by the parties that were set forth in the approved Joint Pre-Trial Order ("PTO") entered in this adversary proceeding on January 17, 2012.  The Court will recite only those facts necessary to a decision on this matter.

[3]   Ex. 1 and stipulated fact 3(g).  The specific repairs contemplated under the Agreement were outlined in Exhibit C to Ex. 1.

[4]   Stipulated fact 3(am).

[5]   ¶ 2.4 of Ex. 1.

[6]   Stipulated fact 3(h).

6.      Article 5.2 of the contract specifically provided that:

> All valid bills and charges to Contractor for material or labor relating to the Work will be paid timely by Contractor and the Property will remain free from claims of liens for labor or material arising directly through Contractors, except that Contractor may reasonably dispute any claim or lien claim or other type of claim that is asserted by Contractor's subcontractors or suppliers if necessary.[7]

7.      The parties clearly contemplated that the actual money paid by the Plaintiffs would be accessible and available for payment of any supplier or subcontractor claim attributable to work on the Plaintiffs' property.

8.      The Plaintiffs initially made an advanced payment of $126,687 (½ of the contract price) to the Defendant when the contract was executed on December 23, 2008. The Plaintiffs would subsequently make additional payments as follows:

| | |
|---|---|
| January 27, 2009 (installment per contract) | $63,000.00 |
| March 16, 2009 (installment + change orders) | $73,878.46 |
| March 24, 2009 (change orders) | $ 5,375.00.[8] |

9.      The initial payment, and all subsequent payments, were to be used for payment of suppliers and subcontractors utilized by the Defendant and his company.[9]

10.     The contract specified that the payments by the Plaintiffs "would be credited to Owner [Plaintiffs] on requests for payment until depleted."[10]

11.     As the sole person in control of his company,[11] the Defendant was singularly responsible for all financial decisions taken in the name of GCS, including all decisions on the payment of bills and other disbursements from the singular bank

---

[7]  ¶ 5.2 of Ex. 1.  See also ¶ 3.4 (C).

[8]  Stipulated fact 3(h).

[9]  ¶ 3.4 of Ex. 1.

[10]  *Id.*

[11]  Stipulated fact 3(d).

account.[12]

12.    At the time of the contract with the Plaintiffs, the Defendant and his company was experiencing significant financial distress.

13.    Indeed, at the time of the contract with the Plaintiffs, the Defendant and GCS were each insolvent.[13]

14.    The Defendant failed to disclose to the Plaintiffs that both he and his company were insolvent on the date that the contract was signed.[14]

15.    At the time of the contract with the Plaintiffs, rather than maintaining separate accounts for corporate and personal expenses,[15] the Defendant was commingling personal and corporate funds.[16]

16.    Funds from various construction projects were deposited into GCS' "purchasing account" at Century Bank, n/k/a Wells Fargo.[17]

17.    The Century Bank account was a singular checking account containing the sole source of funds for all construction expenses as well as the sole source of funds for paying the personal expenses of the Defendant.

18.    Indeed, at the time of the contract with the Plaintiffs, the Defendant had no personal bank account.[18]

---

[12]  Stipulated fact 3(ar).

[13]  Deemed Proven Fact #7 that was deemed proven for the purposes of this case as a sanction against the Defendant issued by the Court on September 15, 2011 [dkt #32] pursuant to Fed. R. Civ. P. 37(b)(2)(A)(i) , as incorporated by Fed. R. Bankr. P. 7037, for the Defendant's persistent failures to fulfill document production obligations regarding such topics during the discovery phase of this adversary proceeding, despite numerous accommodations by the Plaintiffs and extensions granted by the Court.

[14]  Stipulated fact 3(n).

[15]  Stipulated fact 3(j).

[16]  Stipulated fact 3(i).

[17]  Stipulated fact 3(ah).

[18]  Stipulated fact 3(k).

19.     At the time of the contract with the Plaintiffs, GCS was not adequately capitalized and the GCS general ledger showed a negative balance in its account.[19]

20.     Specifically, on the day before the Plaintiffs signed the construction contract and tendered the initial payment of $126,687 to the Defendant, the corporate general ledger showed that the singular bank account at Century Bank had a negative balance of <$38,334.00>.

21.     Thus, notwithstanding the express representation otherwise, the advanced payment of $126,687 made by the Plaintiffs was immediately diverted by the Defendant for the payment of other bills from other construction projects, as well as payment of the Defendant's personal expenses, rather than being dedicated to the payment of bills pertaining to the Plaintiffs' construction project.

22.     The Defendant knowingly and intentionally used the funds paid by the Plaintiffs to pay debts unrelated to the Plaintiffs' project, without first paying current or past due obligations to the subcontractors and suppliers on the project.[20]

23.     None of the financial problems that were occurring to the Defendant and his construction business at the inception of, and during the term of, the contract were disclosed to, or known by, the Plaintiffs.

24.     The first progress payment of $63,000 was due within 30 days of the first labor or material furnished pursuant to the contract.[21]

25.     The Defendant demanded payment of the first progress payment on January 23, 2009, even though the 30-day period specified under the contract for that first progress payment had not yet expired.

26.     The Plaintiffs acceded to the Defendant's demand and made a progress payment of $63,000 on January 27, 2009, even though the 30-day period specified under the contract for that first progress payment had not yet expired.

---

[19]  Stipulated facts 3(al) and (ao).  See generally Ex. 2.

[20]  Ex. 2 and stipulated fact 3(au).

[21]  ¶3.4(B) of Ex. 1.

27. On the date of that first progress payment – January 27, 2009 – all of the Plaintiffs' initial payment of $126,687 had been expended and the corporate general ledger showed a negative balance in the commingled bank account[22] of <$27,737.82>.[23]

28. On the date of that first progress payment, with all of the advance payment of $126,687 having been expended, the Defendant and his company had only incurred expenses of $9,025.99 on the Plaintiff's construction project.[24]

29. The second progress payment of $63,000 was due within 60 days of the first labor or material furnished pursuant to the contract.[25]

30. The Plaintiffs made the second progress payment of $63,000 on March 16, 2009, plus an additional amount of $10,878.46 arising from change orders initiated by the Plaintiffs.

31. On the date of the second progress payment – March 16, 2009 – the corporate general ledger showed a negative balance in the commingled bank account of <$42,228.30>.[26]

32. On March 24, 2009, the Plaintiffs paid an additional $5,375.00 to the Defendant for additional change orders initiated by the Plaintiffs.

33. As of March 24, 2009, the Plaintiffs had paid $268,940 to the Defendant, and only the final payment of $28,888 remained to be paid by the Plaintiffs under the contract.

34. As of March 24, 2009, the Defendant and his company, while having received $268,940 from the Plaintiffs, had only paid expenses of $28,885.21 on the Plaintiffs' construction project.[27]

---

[22] Stipulated fact 3(ap).

[23] Ex. 2 at p. 9.

[24] Ex. 5.

[25] ¶3.4(B) of Ex. 1.

[26] Ex. 2 at p. 14.

[27] Ex. 5.

35.    Substantial delays occurred in the construction project, primarily due to an inability to secure a proper steel beam from January to April 2009 for completion of the framing phase of the construction.

36.    Due to the framing delays, delays were also experienced in the drywall, electrical, flooring and plumbing aspects of the construction project.

37.    Even after a laminated beam was substituted in mid-April, the framing of the house did not resume over the next six weeks.

38.    The project was not completed by the designated completion date of May 1, 2009.[28]

39.    The Plaintiffs rejected a request by the Defendant on May 1 for the tendering of additional funds.

40.    Many of the subcontractors were not being paid during the final months of the Defendant's involvement with the construction project, including the lumber supplier,[29] an electrical contractor,[30] and the portable restroom supplier.[31]

41.    Due to lack of progress, the Plaintiffs hand-delivered a Notice of Default to the Defendant on May 20, 2009, demanding a cure of defaults under the construction contract within ten days.[32]

42.    The Defendant informed the Plaintiffs on May 20, 2009 that the defaults could not be cured within 10 days but that, with the framing issues solved, the project could be completed by July 4.

---

[28]  Ex. 27.

[29]  Ex. 79.  A lien affidavit was filed in July 2009 by ProBuild South for $3,878.22 for unpaid invoices for the months of March through May 2009.

[30]  Stipulated fact 3(at).

[31]  Ex. 81. A notice letter was sent in August 2009 by Lone Star PRR for $240.33 for unpaid invoices for the months of March through June 2009.

[32]  Ex. 18.

43.     The Defendant assured the Plaintiffs on May 20 that the payments they had tendered to him were "safe."

44.     The Defendant could not reacquire the services of needed subcontractors after the May 20 notification and no significant progress was made by the Defendant on the project between May 20 and the date that the contract was terminated on June 2, 2009.

45.     The Plaintiffs terminated the construction contract pursuant to a letter dated June 2, 2009 and therein demanded a refund of all monies paid, less amounts demonstrated to have been paid to suppliers and subcontractors for the Plaintiffs' construction project.[33]

46.     The Plaintiffs' termination of the contract was based upon:  (1) the Defendant's failure to timely prosecute work, (b) the Defendant's failure to pay subcontractors and suppliers, and (c) the Defendant's failure to keep the premises free from the attachment of subcontractor liens.

47.     On the date of the termination of the contract, the Plaintiffs had paid $268,940.46. to the Defendant,[34] while the Defendant had only been invoiced an aggregate amount of $79,603.83 by suppliers and subcontractors for materials and services pertaining to the Plaintiffs' construction project.

48.     On the date of the termination of the contract, the Defendant and his company had completed less than 50% of the work required under the contract.[35]

49.     Although the windows and roof had been installed, the framing, plumbing and electrical aspects of the construction had not been completed by the Defendant and his company.  There was no sheetrock coverage nor any insulation that had been installed as of the termination of the contract.

---

[33]  Ex. 19.

[34]  Stipulated fact 3(i).  Such amount represented 90% of the contract amount plus 100% of change orders made during the course of the work.  *Id*.

[35]  Stipulated fact 3(j).

50. There had been no inspection of the premises as of the contract termination by the City of Dallas because an insufficient quantum of work had been completed by that time.

51. Upon termination of the contract, the Defendant was still in possession of funds paid to him by Plaintiffs.[36]

52. Yet, upon termination of the contract, the Defendant and his company did not return any of the funds previously paid by the Plaintiffs under the contract.[37]

53. The Defendant improperly misappropriated, diverted and dispersed the funds that had been tendered to him by the Plaintiffs for personal non-construction related activities.[38]

54. The Defendant engaged in those misappropriations and diversions in an effort to satisfy obligations on other construction projects as well as to pay his personal expenses in times of financial distress.

55. The Defendant knowingly and intentionally misappropriated the funds paid by the Plaintiffs for his direct personal financial benefit.

56. GCS was the alter ego of the Defendant.

57. On June 30, 2009, the Plaintiffs hired a "completion contractor" – English Heritage Homes of Texas, Inc. ("EHH") under which EHH was to correct the deficiencies or defects in work performed by the Defendant and his company and complete the renovation in accordance with the same plans provided to the Defendant.[39]

58. The Plaintiffs were required to pay over $56,434.95 to EHH for remedial work on the project that was necessary before additional construction steps could be taken.[40]

---

[36] Deemed Proven Fact #6.  *See supra* note 17.

[37] Stipulated fact 3(k).

[38] Deemed Admitted Fact #5.  *See supra* note 17.

[39] Ex. 45 and stipulated fact 3(av).

[40] Ex. 44.

59.    Including the amount paid for remedial work, the Plaintiffs paid a total of $349,500 to EHH in order to correct and complete the work that the Defendant and his company had been contracted to complete.

60.    The charges paid by the Plaintiffs to EHH were reasonable and necessary in order to correct and complete the work that the Defendant and his company had contracted to complete.

61.    The unpaid portion of the contractual amount designated to be paid by the Plaintiffs to the Defendant and his company was $28,888.00.

62.    The Plaintiffs paid a cumulative amount of $618,440.65 to GCS and EHH for their construction project.[41]

63.    On June 8, 2009, the Plaintiffs sued the Defendant and his company in Case No. DC-09-07267 before the 192nd Judicial District Court in and for Dallas County, Texas.[42]

64.    Despite numerous hearings and orders regarding discovery disputes in the state court litigation, the Defendant failed to produce documentation that revealed the disposition of the $268,940 paid to the Defendant and his company by the Plaintiffs.[43]

65.    On April 13, 2010, prior to the entry of any judgment in the state court litigation, the Defendant filed a voluntary petition in this Court seeking relief under Chapter 7 of the Bankruptcy Code.[44]

66.    Plaintiffs subsequently filed the complaint in this adversary proceeding, seeking a determination of the dischargeability of the debt they asserted against the Defendant or, in the alternative, seeking a denial of the Defendant's discharge.

---

[41] Stipulated fact 3(ax).

[42] Stipulated fact 3(k).

[43] Stipulated facts 3(m) through 3(v).

[44] Ex. 21.

*Sanctions Order*

67.   The Defendant continued his pattern of resisting discovery in this adversary proceeding.

68.   On December 20, 2010, the Plaintiffs served a request for production of documents upon the Defendant.  The Defendant did not respond to the request.[45]

69.   On March 9, 2011, the Plaintiffs served a notice of deposition on the Defendant and issued a subpoena duces tecum to GCS, setting the deposition and the document responses for April 13, 2011.[46]

70.   The Defendant did not appear at the scheduled April 13 deposition and did not produce any documents on behalf of himself or his company.[47]

71.   On April 15, 2011, the Beanes filed a motion to compel the deposition of Mr. Gregg and GCS under Fed. R. Civ. P. 37(a).[48]

72.   On May 6, 2011, an Agreed Order on the Motion to Compel was tendered to the Court by the parties under which the Defendant agreed to appear for deposition on Saturday, May 21, 2011 (the Saturday setting granted graciously by the Plaintiffs to accommodate the Defendant's work schedule) and to produce all documents requested.[49]

73.   The Defendant appeared at the Saturday, May 21, 2011 deposition; however, he failed to produce the documents requested and required to be provided by the Agreed Order.[50]

---

[45]   Stipulated fact 3(w).

[46]   Stipulated fact 3(x).

[47]   Stipulated fact 3(y).

[48]   Ex. 53 and stipulated fact 3(z).

[49]   Ex. 54 and stipulated fact 3(aa), as corrected to show 2011 as the correct year.

[50]   Stipulated fact 3(ab), as corrected to show 2011 as the correct year.

74.   In lieu of filing a motion to compel production of documents, the Plaintiffs voluntarily agreed to extend the document production deadline to June 20, 2011.[51]

75.   The Defendant did not fully comply with the agreement to produce documents responsive to the request,[52] notwithstanding all of the accommodations and extensions granted.

76.   The Plaintiffs filed a motion for sanctions on July 5, 2011.[53]

77.   On August 18, 2011, this Court held a hearing on the Plaintiffs' motion for sanctions in which both parties appeared.

78.   As a result of that hearing, and notwithstanding this pro se Defendant's prior delinquencies regarding his discovery obligations, the Court provided the Defendant a final opportunity to comply.

79.   The Court entered an "Order Granting in Part and Provisionally Denying in Part Plaintiffs' Motion for Sanctions" on August 19, 2011.  In addition to awarding fees and expenses to the Plaintiff, the Defendant was ordered to:

> produce all categories of documents responsive to the subpoena duces tecum issued upon him and/or to Gregg Construction Services, LLC **on or before Friday, September 9, 2011** or, in lieu thereof by that stated deadline, file with the Court and serve upon Plaintiffs' counsel a sworn statement, responsive to each category of requested documents, that the Defendant and/or GCS, respectively, do not possess any documents responsive to a particular document request.[54]

80.   The sanctions order further directed that, in the event of the Defendant's failure to comply with the terms of the Order, the Plaintiffs would file a notice of default and the Court would "reconsider the imposition of the more serious sanctions

---

[51]   Stipulated fact 3(ac), as corrected to show 2011 as the correct year.

[52]   Stipulated fact 3(ad).

[53]   Ex. 55 and stipulated fact 3(ae), as corrected to show 2011 as the correct year.

[54]   Ex. 56.

requested by the Plaintiffs in their motion without further notice or hearing."[55]

81.    Notwithstanding the additional time granted by the Court for the fulfillment of his discovery obligations, the Defendant failed to deliver any documents to the Plaintiffs or any alternative statement regarding the unavailability of documents. The Defendant simply ignored the Order.

82.    Thus, on September 15, 2011, the Court entered its "Order Reconsidering and Granting Plaintiffs' Motion for Sanctions" under which the Court ordered that "the following facts ... shall be taken as proven for the purposes of this case:

   (a)    Debtor and/or GCS-Gregg Construction Services, Inc. ("GCS") concealed, destroyed, transferred or failed to keep or preserve, or has permitted to be concealed, destroyed, transferred, kept or preserved property of the estate;

   (b)    Debtor and/or GCS concealed, destroyed or failed to keep or preserve recorded information from which Debtor's financial condition or business transactions could be ascertained;

   (c)    Debtor and/or GCS failed to satisfactorily explain the loss of assets or deficiency of assets to meet Debtor's liability;

   (d)    Debtor and/or GCS failed to maintain proper account records showing direct and indirect costs charged to Plaintiffs;

   (e)    Debtor and/or GCS misappropriated, diverted, dispersed, used and/or retained construction funds paid by the Beanes for personal non-construction related activities;

   (f)    Debtor and/or GCS were still in possession of monies paid to him by Plaintiffs upon the date he was terminated by Plaintiff;

   (g)    Debtor and/or GCS was insolvent and/or in the zone of insolvency throughout the term of the contract with Plaintiffs.[56]

---

[55]  *Id.*

[56]  Ex. 60.

83.    The Defendant, through his alter ego, GCS, or, alternatively, as its officer and agent, represented to the Plaintiffs that the initial payment, and all subsequent payments, would be used for payment of claims by suppliers and subcontractors that rendered supplies or services for the construction on the Plaintiffs' property.

84.    The Defendant, through his alter ego, GCS, or, alternatively, as its officer and agent, represented to the Plaintiffs that GCS was capable of paying on a timely basis all subcontractors and suppliers that rendered services or supplies as to the construction on the Plaintiffs' property.

85.    However, the financial distress of the Defendant and his company at the time of the contract had a direct impact upon GCS' capacity to fulfill its contractual obligations with the Plaintiffs.

86.    On the date of the contract, the Defendant knew that he and his company were financially incapable of properly managing the advanced payments tendered by the Plaintiffs and of performing the contractual provisions relating to the prompt payment of suppliers and subcontractors pertaining to the Plaintiffs' construction project.

87.    On the date of the contract, the Defendant knew that he and his company were financially incapable of completing the contract and fulfilling the contractual obligation for prompt payment of supplier and subcontractors pertaining to the Plaintiffs' construction project without diverting sums from future construction contracts.

88.    The financial distress of the Defendant and his alter ego company, or alternatively as the officer and agent of GCS, thus created circumstances at the time of the contract that imposed a duty upon the Defendant to reveal the deteriorating financial status of himself and his company.

89.    Yet the Defendant, through his alter ego, GCS, or, alternatively, as its officer and agent, concealed from the Plaintiffs at the time of the contract that he and his company were in financial distress.

90.    The Defendant, through his alter ego, GCS, or, alternatively, as its officer and agent, concealed from the Plaintiffs at the time of the contract that the company had an immediate need to divert a substantial portion of the initial payment from the Plaintiffs in order to address an outstanding arrearage of approximately $38,000 in its bank account arising from insufficient checks primarily attributable to unpaid expenses from other construction contracts and other business expenses.

**Page 14 of  24**

91.     The Defendant, through his alter ego, GCS, or, alternatively, as its officer and
        agent, concealed from the Plaintiffs at the time of the contract that he and his
        company had an immediate need to divert a substantial portion of the initial
        payment from the Plaintiffs to cover unpaid and outstanding expenses from other
        construction contracts, other business expenses, and to pay for the Defendant's
        accrued personal expenses and that of his family.

92.     The Defendant, through his alter ego, GCS, or, alternatively, as its officer and
        agent, concealed from the Plaintiffs at the time of the contract that he and his
        company would have an ongoing necessity to divert whatever amounts might be
        paid by the Plaintiffs in the future under the contract to cover unpaid and
        outstanding expenses from other construction contracts, other business expenses,
        and to pay for the Defendant's accrued personal expenses and that of his family.

93.     The Defendant knew that the foregoing representations were false when they were
        made.

94.     The Defendant made the foregoing false representations to the Plaintiffs with the
        intention of deceiving them.

95.     The foregoing false representations induced the Plaintiffs to execute the contract.

96.     In the absence of the false representations, the Plaintiffs would not have executed
        the contract.

97.     In the absence of the false representations, the Plaintiffs would not have tendered
        to the Defendant and his company on the date of the contract one-half of the
        designated contract price for the construction project.

98.     In the absence of the false representations, the Plaintiffs would not have ultimately
        delivered to the Defendant and his company 90% of the designated contract price
        for the construction project.

99.     The Plaintiffs thus actually and justifiably relied upon those representations of the
        Defendant.

100.    The Plaintiffs suffered financial losses in the amount of $320,612.00 as a direct
        and proximate result of that reliance.

101.    To the extent any of these findings of fact constitute conclusions of law, the Court
        expressly adopts them as such.

# CONCLUSIONS OF LAW

1.    The Court has jurisdiction to consider the adversary complaint in this proceeding pursuant to 28 U.S.C. §§1334 and §157.

2.    The Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(I) and (O).

3.    In an action to determine the dischargeability of a debt, the creditor has the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

4.    "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson)),* 107 F.3d 355, 356 (5th Cir. 1997).[57]

5.    Thus, without satisfactory proof of each element of the cause of action pled, judgment must be entered for the Debtor-Defendant.

*Discovery Sanctions*

6.    Federal Rule of Civil Procedure 37, as incorporated into adversary proceedings in bankruptcy cases by Federal Rule of Bankruptcy Procedure 7037 provides the means by which the discovery rules set forth in Rules 26-36 may be enforced. It "provides generally for sanctions against parties or persons unjustifiably resisting discovery."[58]

7.    A failure to obey an order to provide or permit discovery, including an order compelling discovery issued under Fed. R. Civ. P. 37(a), subjects a person to

---

[57]   However, the Fifth Circuit has noted that there are limits to the maxim that exceptions to dischargeability are to be construed narrowly in favor of the debtor, particularly in situations falling under an exception to dischargeability in a case in which a debtor has committed fraud. *See generally Deodati v. M.M. Winkler & Associates (In the Matter of: M.M. Winkler & Associates),* 239 F.3d 746, 751 (5th Cir. 2001).

[58]   FED. R. CIV. P. 37 advisory committee's note (1970).

sanctions under Rule 37(b) which provides a non-exclusive list of possible sanctions that could be invoked against the recalcitrant person.

8.  "Rule 37 sanctions must be applied diligently both to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent." *Hindi v. Toyota Motor Corp.,* 2011 WL 865488, at *3 (E.D. Tex., Mar. 10, 2011) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763-64 (1980)).

9.  "Rule 37(b)(2) gives the court a broad discretion to make whatever disposition is just in the light of the facts of the particular case." 8B Wright, Miller & Marcus, FEDERAL PRACTICE AND PROCEDURE §2289 (3d ed. 2010).

10.  That discretion is limited by two standards in Rule 37(b) – one general and one specific. The rule "requires that any sanction be just and that the sanction must be related to the particular claim which was at issue in the order to provide discovery." *FURminator Inc. v. PetVac Group, LLC,* 2012 WL 3308955, at *9 (E.D. Tex., Aug. 13, 2012) (citing *Compaq Computer Corp. v. Ergonome Inc.,* 387 F.3d 403, 413 (5th Cir. 2004)).

11.  Rule 37(b)(2)(A)(i) specifically states the a court may direct "that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims."

12.  The designation of facts as a sanction is "permissible as an expression of the undoubted right of the lawmaking power to create a presumption of fact as to the bad faith and untruth of an answer begotten from the suppression or failure to produce the proof ordered." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705 (1982). It does not violate due process requirements because "the preservation of due process was secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense." *Id*. (citing *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 350-51 (1909).

13.  The designation of facts against the Defendant occurred in the face of repeated failures to fulfill the discovery duties imposed upon him and the seven facts "taken as proven for the purposes of this case" pertained directly to the scope of requested business documents that should have been provided by the Defendant and the existence of which was not denied by the Defendant.

*Texas Law*

14. Texas law imposes a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations. *Haase v. Glazner*, 62 S.W.3d 795, 800 (Tex. 2001).

15. Fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties. *Id*. at 798-99.

16. The basis of any fraudulent inducement claim is an executed contract that was procured by fraud, without which it would not have been executed, and the damages sought must flow directly from that contract. *Lam v. Phuong Nguyen,* 335 S.W.3d 786, 790 (Tex. App.– Dallas 2011, pet. denied).

17. A party claiming fraudulent inducement must prove: (1) a material misrepresentation, (2) which was false, (3) which was either known to be false when made or was asserted without knowledge of its truth, (4) which was intended to be acted upon, (5) which was relied upon, and (6) which caused injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998).

18. Fraud may also arise by nondisclosure when a party with a duty to disclose facts fails to do so. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex.1997); cited in *Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp*.,  369 F.Supp.2d 848, 858 (E.D. Tex. 2004).

19. Such silence when there is a duty to speak may equate to a misrepresentation of material facts. *Spoljaric v. Percival Tours, Inc*., 708 S.W.2d 432, 435 (Tex.1986); *Ho v. UT Arlington*, 984 S.W.2d 672, 691 (Tex. App. – Amarillo 1998, pet. denied).

20. A duty to speak may arise where: (1) there is a fiduciary relationship; (2) one voluntarily discloses partial information, but fails to disclose the whole truth; (3) one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue; or (4) one makes a partial disclosure and conveys a false impression. *Cronus,* 369 F.Supp.2d at 858, citing, *inter alia*, *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App. – Houston [14th Dist.] 1997, pet. denied).

21.   The financial distress of the Defendant and his company at the time of the contract created circumstances that imposed a duty upon the Defendant and his company to reveal their deteriorating financial status.

22.   The Defendant fraudulently induced the Plaintiffs to enter into the construction contract by failing to disclose the deteriorating financial status of himself and his company.

23.   Generally speaking, a corporate officer's acts on a corporation's behalf are deemed to be acts of the corporation. *Leitch v. Hornsby*, 935 S.W.2d 114, 117–18 (Tex.1996).

24.   However, liability for corporate obligations can be imposed upon an officer or shareholder of a corporation by piercing the protections of the corporate veil of that corporation.

25.   The alter ego doctrine is one theory recognized by Texas law under which the corporate veil may be pierced. *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex.1986)[59]; *Sparks v. Booth,* 232 S.W.3d 853, 868 (Tex. App.– Dallas 2007, no pet.).  That theory may be applied if there is a unity between the corporation and the individual to the extent the corporation's separateness has ceased, and holding only the corporation liable would be unjust. *Id.*

26.   Alter ego is shown from the total dealings of the corporation and the individual, including factors such as: (1) the payment of alleged corporate debts with personal checks or other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his or her personal use; (4) inadequate capitalization; (5) whether the corporation has been used for personal purposes; and (6) other failure to keep corporate and personal assets separate. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex.1990); *Endsley Elec., Inc. v. Altech, Inc.*, 2012 WL 3192101, at * 4 (Tex. App. – Texarkana, Aug. 7, 2012, no pet.).[60]

---

[59]   *Castleberry* set forth six grounds on which the corporate form may be disregarded, but was superseded and circumscribed in part by legislative enactment effective Sept. 1, 1997, 75th Leg., R.S., Ch. 375, § 7, 1997 Tex. Gen. Laws 1522, 1522–23 (amended 2003 & 2007) (current version at TEX. BUS. ORGS. CODE ANN. § 21.223 (Vernon Pamph. 2011)).

[60]   Under §21.223(a)(3) of the Texas Business Organizations Code, the failure of a corporation to observe any corporate formality is no longer a factor in considering whether alter ego exists. TEX. BUS.

27.   The Defendant is individually liable for the debt owing to the Plaintiffs arising from the fraudulent inducement of the Plaintiffs to execute the construction contract because GCS constituted the Defendant's alter ego.

28.   Without reference to any alter ego theory, however, Texas law has long recognized that a corporate officer who knowingly participates in tortious or fraudulent acts may be held individually liable to third persons even though he performed the act as an agent of the corporation and is acting with the course and scope of his employment. *Kingston v. Helm*, 82 S.W.3d 755, 758 -59 (Tex. App. – Corpus Christi 2002, pet. denied) (citing *Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369, 375 (Tex.1984); *Ward Family Foundation v. Arnette (In re Arnette)*, 454 B.R. 663, 697 (Bankr. N.D. Tex. 2011).

29.   Under such circumstances, it is not necessary that the "corporate veil" be pierced in order to impose personal liability upon that officer, as long as it is shown that the corporate officer knowingly participated in the wrongdoing. *Kingston,* 82 S.W.3d at 758; *Walker v. Anderson,* 232 S.W.3d 899, 918 (Tex. App. – Dallas 2007, no pet.); *Kwasneski v. Williams (In re Williams)*, 2011 WL 240466, at *1 (Bankr. W.D. Tex., Jan. 24, 2011).

30.   The Defendant is individually liable for the debt owing to the Plaintiffs arising from his fraudulent inducement of the Plaintiffs to execute the construction contract for the financial benefit of himself and his company.

31.   As for the proper measurement of damages, the Fifth Circuit has recently recognized that:

> Texas law recognizes three types of damages for fraud:  out-of-pocket damages, consequential damages and benefit-of-the-bargain damages.  Out-of-pocket damages allow the injured party to recover the actual injury suffered measured by the difference between the value of that which he has parted with, and the value of that which he has received.  Consequential damages permit plaintiffs to recover damages that are foreseeable and directly traceable to the fraud and result from it and must be properly pleaded and proved.  Benefit-of-the-bargain damages derive from an expectancy

---

ORGS. CODE ANN. § 21.223(a)(3) (Vernon Pamph. 2011).

theory and evaluate the difference between the value that was
represented and the value actually received.

*Bohnsack v. Varco, L.P.*, 668 F.3d 262, 275 (5th Cir. 2012) (citations and internal
quotations omitted).

32.     Benefit-of-the-bargain damages are unavailable in the absence of an enforceable
        contract, but "are appropriate in cases of fraudulent inducement when they are
        satisfactorily proven." *Id*. at 275-76.

33.     These alternatives by which damages are properly measured in a Texas fraudulent
        inducement case clearly encompass the out-of-pocket losses proven by the
        Plaintiffs by a preponderance of the evidence at trial in the amount of $320,612 –
        computed by the Plaintiffs as the excess of the reasonable and necessary costs
        incurred by them to complete the construction project over and above the unpaid
        portion of the contract price) [$349,500 - $28,888 = $320,612].[61]

34.     The Defendant is individually liable for a debt owing to the Plaintiffs in the
        amount of $320,612 arising from his fraudulent inducement of the Plaintiffs to
        execute the construction contract for the financial benefit of himself and his
        company.

*Nondischargeability Under 523(a)(2)(A): Debt Arising by Fraud, False Pretenses,
or False Representation*

35.     11 U.S.C. §523(a)(2)(A) of the Bankruptcy Code provides that:

            a discharge under §727 of this title does not discharge an
            individual debtor from any debt for money, property, or
            services, ... to the extent obtained by false pretenses, a false
            representation, or actual fraud, other than a statement
            respecting the debtor's or an insider's financial condition.

---

[61] This is true notwithstanding the fact that the remedial measure of damages presented by the
Plaintiffs at trial was technically the measure for a "complete failure of performance to construct a
building." *See, e.g., Stonehill-PRM WC I, L. P. v. Chasco Constructors, Ltd.*, 2009 WL 349136, at *7
(Tex. App. – Austin, Feb. 11, 2009) (citing *Ashley v. Bizzell*, 694 S.W.2d 349, 353 (Tex. App.– San
Antonio 1985, writ ref'd n.r.e.). *See, e.g., Stonehill-PRM WC I, L. P. v. Chasco Constructors, Ltd.*, 2009
WL 349136, at *7 (Tex. App. – Austin, Feb. 11, 2009) (citing *Ashley v. Bizzell*, 694 S.W.2d 349, 353
(Tex. App.– San Antonio 1985, writ ref'd n.r.e.).

36.    Section 523(a)(2)(A) encompasses similar but distinct causes of action.  Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[62] the Fifth Circuit has distinguished the elements of "actual fraud" from those involving "false pretenses and false representations."  *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995).

37.    The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event as opposed to a representation regarding a past or existing fact.  *Bank of Louisiana v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991) ["In order . . . to be a false representation or false pretense under § 523(a)(2), the false representations and false pretenses [must] encompass statements that falsely purport to depict current or past facts.  [A debtor's] promise ... related to [a] future action [which does] not purport to depict current or past fact . . . therefore cannot be defined as a false representation or a false pretense"].[63]

38.    To have a debt excepted from discharge pursuant to the "actual fraud" provision in §523(a)(2)(A), an objecting creditor must prove that (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained losses as a proximate result of the representations.  *Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

---

[62]  *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987).  Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT&T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A).  Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of  reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions strains credibility.

[63]  Though some in this circuit have rejected these parallel tests as a distinction without a difference and proceeded with a unitary approach to the problem, *see In re Melancon*, 223 B.R. 300, 308 (Bankr. M.D. La. 1998), this Court feels compelled to recognize and attempt to apply the distinction drawn by the circuit court.

39.     A debt may also be declared nondischargeable under §523(a)(2)(A) if it was obtained by if it was obtained by false pretenses or by a false representation.

40.     While "false pretenses" and "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement. *See Walker v. Davis (In re Davis),* 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003).

41.     In order for a debtor's representation to constitute a false pretense or a false representation, it "must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party."[64] *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992) and *Bercier*, 934 F.2d at 692.

42.     The Plaintiffs have successfully demonstrated the existence of each element under both the actual fraud and false representation prongs of §523(a)(2)(A), sufficient to render his $320,612 debt to the Plaintiffs non-dischargeable under that statute.

43.     Court costs of $250.00 are also awarded to the Plaintiffs to be paid by the Defendant.

44.     Thus, the Plaintiffs, Jerry and Linda Beane, shall recover from the Defendant, James A. Gregg, the sum of $320,612.00, plus court costs of $250.00, together with post-judgment interest upon such aggregate sum at the current federal post-judgment interest rate of 0.18% until paid.  Such indebtedness is declared to be non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A).[65]

---

[64] Though the Supreme Court in *Field v. Mans* avoided a determination of the degree of reliance required in a false pretense or false representation case, it is reasonable to assume that justifiable reliance, in addition to reliance in fact, is the correct level of reliance required to sustain a finding of nondischargeability in a false pretense or false representation case.  *In re Hernandez*, 208 B.R. 872, 876 n.4 (Bankr. W.D. Tex. 1997).

[65] Accordingly, the Court need not reach the issues and arguments presented with respect to the alleged nondischargeability of this debt under other subsections of §523(a) and, as confirmed with the Plaintiffs at trial, the declaration of non-dischargeability under §523 precludes the necessity of reaching the alternative grounds pled by the Plaintiffs under §727.

45.     All other relief requested in the Plaintiff's Complaint in the above-referenced adversary proceeding shall be denied.

46.     To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

47.     An appropriate judgment shall be entered consistent with these findings and conclusions.


Signed on 09/28/2012


THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE